CMM CABLE REP, INC., d/b/a Creative Media Management, Inc., an Ohio Corporation, Plaintiff,

v.

KEYMARKET COMMUNICATIONS, INC.; Keymarket Communications of Pennsylvania, Inc., d/b/a Keymarket Communications of NEPA, Inc.; Radio Station WKRZ–FM, Pittston, Pennsylvania; Barry Drake, individually; Frank Bell, individually; Gerald Getz, individually, Eagle Syndication, Inc., d/b/a Eagle Marketing, Inc.; and Paul Meacham, individually, Defendants.

Civ. A. No. 3:CV–94–1602.

United States District Court, M.D. Pennsylvania.

Oct. 7, 1994.

Steve D. Shadowen, Harrisburg, PA, Anne Mason, Joseph Mason, Clearwater FL, Lori Gianneschi, Philadelphia, PA, for plaintiff.

Donald H. Brobst, Wilkes Barre, PA, for defendants.

## MEMORANDUM

VANASKIE, District Judge.

Presently pending before the Court is plaintiff's motion for a preliminary injunction restraining defendants from infringing plaintiff's alleged copyright and trade dress rights in connection with a radio promotion that pays listeners a fixed sum per hour until another listener responds to the radio station when his or her name is called. Specifically, plaintiff claims that defendants infringed its rights to its PAYROLL PAYOFF® campaign by a promotion entitled "THE ULTIMATE JOB" presently being aired by WKRZ–FM.

An evidentiary hearing was conducted on October 5, 1994. The parties submitted Memoranda of Law on October 6, 1994. In accordance with the Findings of Fact and Conclusions of Law set forth below, plaintiff's motion will be granted and defendants will be preliminarily enjoined from continuing THE ULTIMATE JOB campaign. The preliminary injunction, however, will not preclude defendants from using an accumulating cash award promotion format and will not prevent defendants from using as its pool of contestants those persons who have responded to its ULTIMATE JOB promotion.

## FINDINGS OF FACT

1. Plaintiff CMM Cable Rep., Inc. d/b/a Creative Media Management, Inc. ("CMM") is a corporation with its principal office and place of business in the State of Florida.

2. Defendant KEYMARKET COMMUNICATIONS, INC. ("KEYMARKET") owns Radio Station WKRZ–FM, which does business in the Wilkes–Barre/Scranton, Pennsylvania area.

3. Defendant FRANK BELL is Director of Marketing for and a principal of KEYMARKET.

4. Defendant GERALD GETZ is the General Manager of WKRZ–FM.

5. Defendant EAGLE SYNDICATION, Inc., d/b/a EAGLE MARKETING, INC. ("EAGLE MARKETING") is a competitor of CMM in the business of marketing promotional campaigns to radio stations.

6. Defendant PAUL Meacham is a principal of EAGLE MARKETING.[1]

7. CMM is engaged in the business of developing and marketing promotional campaigns for radio stations to bolster the listener audience.

8. CMM's promotions are designed and sold on a market-exclusive basis and are effective only if used exclusive of other stations in a particular market area.

9. The market-exclusive concept is standard in the business of radio station promotional campaigns. Radio stations purchasing a promotional campaign generally expect that the seller, such as CMM, will not sell the same campaign to a competing radio station.

10. CMM's services are marketed nationally to radio stations by mail and personal solicitations, informational brochures, and advertising in trade journals.

11. Two of CMM's promotions are entitled PAYROLL PAYOFF® and PAYCHECK PAYOFF®, which campaigns have been marketed to and purchased by 33 radio stations in the United States on a market-exclusive basis.

12. PAYROLL PAYOFF® and PAYCHECK PAYOFF® promotions are responsible for more than 30% of CMM's current revenues and more than 50% of the promotional campaigns it is currently producing.

13. The general concept of the PAYROLL PAYOFF® and PAYCHECK PAYOFF® promotions is to entice a listener to tune into the radio station by promising pay-

---

1. CMM concedes that Paul Meachum had not been served as of the date of the preliminary injunction hearing. Under these circumstances, the ruling embodied in this Memorandum does not apply to Meachum. As used herein, the term "defendants" shall refer to all defendants who have been served with process.

ment of an "hourly wage" by the radio station if the listener calls in after his or her name is selected and read on the air. One name is read each hour during a pre-determined time span. If a listener does not call the radio station in response to his or her name being read over the air, the prior successful caller continues to be paid. This caller gets paid an amount every hour until the next successful caller responds to his or her name being read on the air or until the contest ends. Listeners supply their names to the station in response to direct mail pieces containing mail-in or fax-in forms.

14. CMM owns all right, title and interest in the copyright on the promotional materials, artwork and informational brochures for PAYROLL PAYOFF® and for PAYCHECK PAYOFF®, which embodies the concept and methodology for this promotion. CMM has received from the Register of Copyrights (i) a Certificate of Registration, dated June 1, 1992, No. TX 3 333 965, entitled PAYROLL PAYOFF, and (ii) a Certificate of Registration dated June 1, 1992, No. TX 3 643 920 entitled PAYCHECK PAYOFF. The "nature of the authorship" for which copyright registration was made for PAYROLL PAYOFF® and PAYCHECK PAYOFF® encompasses the "[e]ntire text and graphic design," and CMM represented that publication had first occurred in April of 1991.

15. CMM owns a federal trademark registration for both PAYROLL PAYOFF® and PAYCHECK PAYOFF®. Registration with the United States Patent and Trademark Office was made on January 26, 1993. (PX–3).

16. CMM is paid by its radio station customers to prepare all printed material associated with the promotion and to handle the actual mailing associated with the on-air promotions. Stations will not buy CMM's products and services absent an exclusive right to the promotion in the broadcast area.

17. Plaintiff's promotion was purchased by Radio Station Magic 93—WMGS–FM, in Wilkes–Barre, Pennsylvania on or about August 2, 1994, for $21,875.00, with an addendum contract on September 2, 1994 for $22,-300.00, for a total sale of $44,175.00. That station started its pre-promotion of the campaign on Monday, September 19, 1994, with the actual on-air give aways to commence on Monday, September 26, 1994. The WMGS promotion offers to pay an hourly rate of $25.00 per hour, Monday through Friday from 7:00 a.m. to 5:00 p.m., except on Thursdays, when $50.00 is the "wage."

18. KEYMARKET had access to CMM's copyrighted PAYROLL PAYOFF® and PAYCHECK PAYOFF® materials because CMM provided KEYMARKET with its promotional materials and promotional plans and requested an opportunity to discuss direct marketing opportunities with KEYMARKET several times in the past.

19. The PAYROLL PAYOFF® promotion was actually sold to KEYMARKET for use at Radio Station WKSE–FM in Buffalo, New York, an affiliate of WKRZ–FM and a KEYMARKET-owned station, for market-exclusive use in the Buffalo area during the Fall 1994 Rating Period.[2]

20. The PAYROLL PAYOFF® program is intended to increase a radio station's audience ratings, which in turn enables a radio station to charge more for advertising time. The Spring and the Fall rating periods are the most important rating periods for a radio station.

21. WKRZ–FM ("KRZ") and WMGS–FM are competitors for audience and advertisers in the Wilkes–Barre/Scranton area.

22. KRZ is the dominant radio station in the Wilkes–Barre/Scranton area.

23. In the Spring of 1994, WMGS, for the first time, secured a larger audience rating than KRZ for the 25 year-old to 54 year-old age group.

24. Prior to August, 1994, defendant Frank Bell was aware of the CMM PAYROLL PAYOFF® promotion and regarded it to be a "syndicated" promotion.

25. During the summer of 1994, Frank Bell authorized Key Market's Radio Station in Buffalo, New York, WKSE–FM, to enter

---

2. Rating periods for radio stations generally run for twelve weeks. A radio station's audience rating has a direct correlation to the advertising rates it can charge.

into a contract with CMM for the PAYROLL PAYOFF® promotion.

26. Defendant Frank Bell instructed EAGLE MARKETING to prepare a direct mail "flier" to be distributed in the Wilkes–Barre/Scranton area for a radio promotion entitled the "THE ULTIMATE JOB."

27. KEYMARKET paid EAGLE MARKETING $34,000 for the "ULTIMATE JOB" campaign.

28. "THE ULTIMATE JOB" promotion offers to pay $100.00 per hour to listeners who call KRZ in response to their names being read over the air Monday through Friday from 8:00 a.m. to 8:00 p.m.

29. KRZ typically offers promotions that pay in $100 units.

30. The WMGS and KRZ promotional campaigns had the same essential elements—a direct mail flier with response cards to be mailed or telefaxed to the radio station; promotional "teasers" broadcast to create interest in the campaign; and the selection of one name per hour. Both promotional campaigns utilized the concept of "earning an hourly wage." The KRZ direct mail piece repeatedly states "earn $100 an hour." The WMGS direct mail piece uses the phrase "make $25 per hour" and twice invites the recipient to "call in, clock in & win." A time clock is featured on the WMGS direct mail piece. Neither a time clock or the "clock in" invitation is expressed in the KRZ direct mail piece. Radio personalities for KRZ, however, repeatedly invited listeners to "clock in." Although the KRZ direct mail piece does not use the trademark registered phrase "PAYROLL PAYOFF®," its radio personalities repeatedly advised its listeners to "get on the payroll" or "get on the KRZ payroll."

31. Although a clock is featured on the KRZ mailer, that clock refers to KRZ's practice to interrupt its music programs only twice during each hour.

32. KRZ's on-air prize awards commenced the same day as the PAYROLL PAYOFF® give aways began at WMGS—September 26, 1994.

33. CMM promptly notified KEYMARKET that it considered the ULTIMATE JOB campaign to infringe on CMM's statutory and common law rights.

34. KRZ's ULTIMATE JOB promotion is substantially similar to CMM's PAYROLL PAYOFF® promotion, and listeners have been confused as to whether the KRZ promotion is the same promotion as that being broadcast on WMGS.

35. CMM and WMGS had been negotiating for the PAYROLL PAYOFF® program prior to the time that KEYMARKET'S Buffalo, New York subsidiary entered into a contract for the same campaign.

36. CMM's inability to maintain market-exclusivity for its promotional campaigns will have a drastic effect on its business.

37. Sixty percent of CMM's business is repeat business from radio stations.

38. KRZ's promotion of its campaign on the air is more similar to the PAYROLL PAYOFF® promotion than is KRZ's direct mail piece.

39. In the business of radio promotional campaigns, CMM is associated with the PAYROLL PAYOFF® promotion.

40. The CMM/WMGS contract grants to WMGS a right of first refusal for the PAYROLL PAYOFF® campaign in subsequent rating periods. In other words, before CMM could sell the campaign to a WMGS competitor, such as KRZ, CMM would first have to grant to WMGS an opportunity to purchase it. WMGS insisted upon the first right of refusal.

41. WMGS marketed the PAYROLL PAYOFF® campaign to its advertisers and generated advertising revenues based upon the perceived attractiveness of this campaign.

42. WMGS increased the mailings under the program by approximately 80,000 direct mail pieces because of its success in promoting this campaign with its advertisers.

43. An increasing jackpot or accumulating award is not unique in radio promotional campaigns.

**636** ◼

44. KEYMARKET has used a cash give away promotion at its local country western radio station, "Froggy 101," titled the "Froggy Payroll."

45. The "Froggy Payroll" simply pays a fixed amount that does not accumulate.

### DISCUSSION

◼ Consideration of the following factors governs the determination of a motion for preliminary injunctive relief:

(1) The likelihood that the plaintiff will prevail on the merits at a final hearing;

(2) The extent to which the plaintiff will suffer irreparable harm if the conduct complained of is not enjoined pending the final hearing;

(3) The extent to which the defendant will be harmed if a preliminary injunction is entered; and

(4) Whether the public interest is served by issuance of a preliminary injunction. *Optician's Ass'n v. Independent Opticians,* 920 F.2d 187, 191–92 (3rd Cir.1990).

### A. *LIKELIHOOD OF PREVAILING*

#### 1. *Copyright Infringement.*

◼ To prevail on its copyright infringement claim, CMM must establish (a) ownership of a valid copyright and (b) "copying" by the defendants. *See Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 797 F.2d 1222, 1231 (3rd Cir.1986), *cert. denied, Jaslow Dental Laboratory, Inc. v. Whelan Associates, Inc.,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). For purposes of the preliminary injunction motion, KEYMARKET conceded that CMM is the owner of a valid copyright to the PAYROLL PAYOFF® material.

◼ KEYMARKET, however, argues that CMM's copyright is limited to the direct mail pieces and that it independently developed its own direct mail piece for the KRZ ULTIMATE JOB PROGRAM. CMM counters by arguing that its copyright extends to "its expression of the copyrighted material, and unauthorized copying of material—whether by radio broadcast or print—is actionable." (CMM's Post–Hearing Brief at p. 9)

Among the factors to be taken into consideration in a copyright infringement action is "the nature of the protected material and the setting in which it appears." *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 908 (3rd Cir.1975), *cert. denied, Universal Athletic Sales Co. v. Pinchock,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975). *Accord, Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 619 (7th Cir.1982), *cert. denied, North American Philips Consumer Electronics Corp. v. Atari, Inc.,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). CMM's copyrighted material concerned a radio promotional campaign conducted by both direct mail and broadcast announcements. Defendants' actions must therefore be assessed in the context of both the direct mail pieces *and* the related broadcasts. Accordingly, consideration of CMM's copyright infringement claim will not be limited to a comparison of direct mail pieces.

◼ KEYMARKET asserts that it developed its ULTIMATE JOB campaign independent of CMM's product. Independent creation of an identical work is a complete defense to a copyright infringement claim. *Whelan Associates,* 797 F.2d at 1227 n. 7. Moreover, where "the similarities between works was not on account of copying but because both parties drew from common sources that were part of the public domain," *id.* at 1231 n. 23, a claim of infringement cannot be established. KEYMARKET's contention that it did not rely upon the PAYROLL PAYOFF® promotional program in creating the ULTIMATE JOB campaign is belied by several facts, including defendant Frank Bell's unsolicited testimony that he was aware that CMM had "syndicated" the PAYROLL PAYOFF® campaign; that KEYMARKET had utilized the term "payroll" in connection with other promotional give aways that did not provide for an accumulating prize but deliberately avoided the term "payroll" in its written direct mail pieces for the ULTIMATE JOB program; and that Bell, as director of marketing for KEYMARKET, expressed displeasure that KRZ radio personalities invited listeners to "clock in" or "get on the clock" in connection

with the ULTIMATE JOB program, key features of the CMM promotion.[3] Accordingly, it cannot be concluded that the ULTIMATE JOB campaign was established independent of the PAYROLL PAYOFF® program or that CMM and KEYMARKET drew from common sources that were in the public domain.

■ "[I]t is rarely possible to prove copying through direct evidence...." *Whelan Associates,* 797 F.2d at 1231. In recognition of this fact, it has been held that "copying may be proved inferentially by showing that the defendant had access to the allegedly infringed copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work." *Id.* at 1231–32.

Although KEYMARKET contends that it did not copy the CMM copyrighted material, it cannot deny the fact that it had access to the CMM copyrighted material. CMM had sent to KEYMARKET promotional literature concerning the PAYROLL PAYOFF® campaign, including samples of direct mail pieces. In addition, KEYMARKET had entered into a contract with CMM for the PAYROLL PAYOFF® campaign for KEYMARKET's Buffalo, New York station.

Thus, since it is clear that KEYMARKET had access to CMM's copyrighted promotion, the pertinent question is whether there is substantial similarity between the PAYROLL PAYOFF® and ULTIMATE JOB promotions. *Whelan Associates,* 797 F.2d at 1232. Before addressing the question of "substantial similarity," however, the scope of the copyright must be ascertained.

"It is axiomatic that copyright does not protect ideas, but only expressions of ideas." *Whelan Associates,* 797 F.2d at 1234. This concept is embodied in 17 U.S.C. § 102(b), which provides:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

This "basic principle [is] easy to articulate but difficult to apply...." *Universal Athletic Sales,* 511 F.2d at 906.

In this case, the "idea" is a radio promotional cash give away that has the following features:

(1) A direct mail piece that requires registration to participate in the giveaway;

(2) listening to the radio station to determine if a contestant's name is called; and

(3) an accumulating cash prize.

Thus, a copyright infringement claim is not established by virtue of the fact that both the CMM PAYROLL PAYOFF® and KEYMARKET ULTIMATE JOB campaigns have these identical features.

The protectible "expression" of the idea is the hourly wage analogy. This is the descriptive feature of the promotion. It is this "packaging" that creates interest and distinguishes this accumulating cash prize from other programs that have a building jackpot.

To determine whether CMM's copyright has been infringed, the similarity between CMM and KEYMARKET's accumulating cash award programs must be assessed. *Whelan Associates,* 797 F.2d at 1232; *Sid & Marty Krofft Television v. McDonald's Corp.,* 562 F.2d 1157, 1164 (9th Cir.1977). Both programs draw upon the employment analogy. Both programs are targeted towards those who listen to the radio while working. Both programs rely upon the time clock feature of hourly employment, although KRZ's reliance upon this feature is limited to announcements made by radio personalities. In the manner of their execution, there is indeed substantial similarity between the CMM and KEYMARKET programs.

The final question is whether there has been improper appropriation, with the test being "whether an ordinary lay observer would detect a substantial similarity between the works." *Universal Athletic Sales,* 511 F.2d at 907. "The *sine qua non* of the ordinary observer test ... is the overall similarities rather than the minute differences

---

**3.** Bell's displeasure supports an inference that he understood that a promotion featuring an invitation to "clock-in" and "earning" an hourly wage was the protectible property of CMM.

between the two works...." *Atari*, 672 F.2d at 618.

KEYMARKET has referred to the dissimilarities between the KRZ and WMGS direct mail pieces. It has been recognized, however, that "infringement may be found where the similarity relates to a matter which constitutes a substantial portion of plaintiff's work—*i.e.*, a matter which is of value to plaintiffs." *Id.* In this case, what is of substantial value to CMM is the expression of "earning" an "hourly wage" until another contestant telephones the radio station after that person's name is called. The salary and earnings analogies, the invitations to "clock in," "punch in," "get on the payroll," or "get on the clock" are central to the expression of the idea that creates an interest in the program. From a lay observer's perspective, both the CMM and KEYMARKET programs share this feature. In this regard, it is significant that KRZ broadcast a telephone call from an audience listener who inquired whether KRZ's promotion was "this ... payroll thing." It is also significant that WMGS received cards for contestants for the KRZ promotion. Accordingly, from a lay observer's perspective, the promotional campaigns are "substantially similar."

In summary, CMM has copyright protection to its PAYROLL PAYOFF® radio promotion that encompasses both the direct mail pieces and the broadcasts promoting the campaign. KEYMARKET had access to the CMM copyrighted material. KEYMARKET's ULTIMATE JOB campaign for KRZ is substantially similar to the CMM PAYROLL PAYOFF® promotion purchased by KRZ's competitor, WMGS. Accordingly, CMM has established a substantial likelihood of prevailing on the merits of its copyright infringement claim.

### 2. *Trade dress infringement*

Defendants concede that "[p]laintiff's promotion ... can be protected to a limited extent through the trademark and copyright laws." (Defendants' Post–Hearing Brief at p. 24.) They also acknowledge that "[t]he law precludes others from using confusingly similar trademarks or copying protected expressions." (*Id.*)

CMM contends that PAYROLL PAYOFF® "is a unique and inherently distinctive product protected from misappropriation, and constitutes [CMM's] trade dress under 15 U.S.C. § 1125." (CMM's Memorandum of Law in Support of Motion for Preliminary Injunction at p. 7) The requisite elements to establish trade dress protection are:

(1) That the imitated feature is non-functional,

(2) That the imitated feature has acquired a secondary meaning, and

(3) That consumers are likely to confuse the source of the plaintiff's products with that of defendant's product. *Merchant & Evans v. Roosevelt Building Products*, 963 F.2d 628, 633 (3rd Cir.1992).

CMM acknowledges that there are certain functional aspects of its promotion, such as having listeners respond to direct mail pieces and having the listeners tune in to the radio station. Another functional aspect, not conceded by CMM, is the accumulating cash award. These functional features are not protectible.

Non-functional features refer to "[d]istinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product...." *Stormy Clime, Ltd. v. Progroup, Inc.*, 809 F.2d 971, 977 (2nd Cir.1987). Packaging the accumulating cash award format as an hourly wage or salary constitutes such a non-functional feature. As explained in *Merchant & Evans*, 963 F.2d at 633, the distinction between "functionality" and "non-functionality" is whether "a particular feature of a product is substantially related to its value as a product or service ... or whether the primary value of a particular feature is the identification of the provider." In this case, the packaging of the accumulating cash award as an hourly wage serves to identify the provider and has no intrinsic value as a product or service.

CMM has also demonstrated a likelihood of establishing that its promotion has secondary meaning. "A mark or dress has been held to have secondary meaning when it 'has come through use to be uniquely associ-

ated with a specific source.'" *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3rd Cir.1978). CMM presented the testimony of a consultant in the radio industry who testified that the PAYROLL PAYOFF® promotion is associated with CMM. The General Manager for WMGS also testified that the packaging of an accumulating cash award in an employment context is associated with CMM. Perhaps most tellingly, defendant Frank Bell testified that it was his understanding that PAYROLL PAYOFF® was a syndicated product of CMM. Under these circumstances, a reasonable likelihood of establishing a secondary meaning has been established.

Finally, CMM demonstrated a likelihood of establishing confusion. The consuming public in this case consists of radio stations. Witnesses called by CMM testified as to the likelihood of confusion among radio stations as to the source of KEYMARKET's ULTIMATE JOB campaign. Accordingly, CMM has demonstrated a likelihood of prevailing on its trade dress infringement claim.

### B. *IRREPARABLE HARM*

■ "A copyright plaintiff who makes out a prima facie case of infringement is entitled to a preliminary injunction without a detailed showing of irreparable harm." *Apple Computer v. Franklin Computer*, 714 F.2d 1240, 1254 (3rd Cir.1983), *cert. dismissed, Franklin Computer v. Apple Computer*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). Indeed, there is a rebuttable presumption of irreparable harm once a reasonable likelihood of proving copyright infringement is established. *See Marco v. Accent Publishing Co.*, 969 F.2d 1547, 1553 (3rd Cir.1992); *Educational Testing Services v. Katzman*, 793 F.2d 533, 543–44 (3rd Cir.1986); *Apple Computer*, 714 F.2d at 1254.

■ Defendants did not present any evidence to rebut the presumption of irreparable harm flowing from CMM's demonstration of a likelihood of prevailing on its copyright infringement claim. Moreover, the evidence

produced by CMM buttressed the presumption. CMM presented persuasive evidence that market-exclusivity is central to its business. It also established that the PAYROLL PAYOFF® Promotion is a very important part of its business. Failure of CMM to protect the market exclusivity could destroy the value of its copyrighted promotion.

In the trademark context, our Court of Appeals has held that "[a] finding of irreparable injury can ... be based on likely confusion." *Optician's Ass'n*, 920 F.2d at 196. Indeed, "'establishing a high probability of confusion as to sponsorship inevitably establishes irreparable harm.'" *Id.* Because the evidence supports a finding of a high probability of confusion, irreparable harm in connection with the trade dress infringement claim has also been established.

### C. *THE BALANCE OF HARM AND THE PUBLIC INTEREST*

■ KEYMARKET argues that granting a preliminary injunction portends severe financial consequences for it. It claims that by being compelled to withdraw KRZ's current promotion during the important Fall ratings season it will suffer a 10% reduction in market share, resulting in loss of revenues of more than $400,000. KEYMARKET further contends that this loss of revenue will depress KRZ's market value by more than $3,000,000 at a time when KEYMARKET is seeking to merge with other companies.

These dire consequences are premised upon the assumption that KEYMARKET will be unable to carry *any* attractive promotion during the Fall rating season. The injunctive relief to be issued by this Court, however, is not as broad as defendants feared. KRZ will remain able to air a promotion that includes an accumulating cash award, but simply may not do so in the guise of a wage or salary. Accordingly, preliminary injunctive relief is not likely to have the adverse results that KEYMARKET predicts.[4]

---

4. KRZ is the dominant radio station in the Wilkes–Barre/Scranton market. KEYMARKET did not contend that it would lose its market leader position as a result of preliminary injunc-

tive relief. The promotion at issue was to run only until November 28, 1994, but KEYMARKET expressed revenue losses for an entire year. It is unlikely that an injunction against the ULTI-

The public interest weighs heavily in favor of a preliminary injunction. "[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections, and correspondingly, prevent the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Apple Computer,* 714 F.2d at 1255. The Copyright Act authorizes a district court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Indeed, the judgement "that free expression is enriched by protecting the creation of authors from exploitation by others" was expressed in Article 1, § 8, Cl. 8 of the United States Constitution. *See Dallas Cowboys Cheerleaders v. Score Board Posters,* 600 F.2d 1184, 1187 (5th Cir.1979). "Preliminary injunctions are a common judicial response to the ... infringement of an apparently valid copyright." *Id.* Accordingly, the public interest will be served by issuance of a preliminary injunction.[5]

## CONCLUSIONS OF LAW

1. CMM has established a reasonable likelihood of prevailing on its claim of copyright infringement under 17 U.S.C. § 501.

2. CMM has established that there is a likelihood of confusion that the ULTIMATE JOB promotion emanates from the same source as the PAYROLL PAYOFF® copyright promotion and it is thus likely that CMM will prevail on the merits of its trade dress infringement claim.

3. There exists the likelihood of immediate and irreparable harm to CMM if a preliminary injunction is denied.

4. The public interest warrants issuance of a preliminary injunction and the balance of hardships tips in favor of CMM.

MATE JOB promotion will adversely affect revenues for an entire year. Moreover, testimony concerning a reduction in the value of the radio station was not supported by evidence concerning a concrete prospective merger being pursued at this time.

5. The public interest is also served by allowing KRZ, if it elects to continue an accumulating cash award program, to consider as contestants

## CONCLUSION

For the reasons set forth above, CMM's motion for preliminary injunction will be granted and defendants will be preliminarily restrained from pursuing its present accumulating cash award promotion under THE ULTIMATE JOB format. Nothing herein, however, is intended to preclude defendants from utilizing another accumulating cash award format. And nothing herein is intended to preclude defendants from using as its pool of eligible contestants the response cards received or to be received in connection with its ULTIMATE JOB promotion. What defendants must do, however, if they intend to continue with an accumulating cash award, is to re-package the manner in which that promotion is expressed.

Rule 65(c) of the Federal Rules of Civil Procedure provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

KEYMARKET expended approximately $34,000 for its ULTIMATE JOB program. Issuance of the preliminary injunction may effectively destroy the value of that investment. Moreover, although the limited scope of the preliminary injunction issued ameliorates the harm to KEYMARKET, it appears reasonable that some harm may result from issuance of a preliminary injunction. For example, additional sums may have to be expended to re-package the current promotion and there may be an adverse effect on the audience resulting in reduced advertisement rates. In order to protect defendants from costs and damages they may

those who responded to its ULTIMATE JOB direct mail pieces. Those materials which are already in the public arena cannot be retrieved. It would serve no meaningful purpose to preclude use of those return cards already received. Nor would it serve any meaningful purpose to compel KRZ to disregard response cards it receives during the next several weeks.

incur if it is found that the injunction was wrongfully issued, CMM will be required to provide security in the amount of $100,000.

## *ORDER*

**NOW, THEREFORE,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. Pending the entry of final judgment in this action, defendants and each of them, their officers, agents, servants, employees, and attorneys, and all persons acting in concert or participation with them, are hereby enjoined from authorizing or engaging in any activity of broadcasting, transmitting, publishing, distributing or otherwise communicating generally to the public any material known as "THE ULTIMATE JOB."

2. Nothing herein is intended to preclude defendants from utilizing an accumulating cash award promotion concept and nothing herein is intended to preclude defendants from considering as the pool of eligible contestants for such an award the cards and telefaxes received in response to THE ULTIMATE JOB promotion.

3. This preliminary injunction shall become effective upon the posting of a bond by CMM Cable Rep., Inc. d/b/a Creative Media Management, Inc. pursuant to Rule 65(c) of the Federal Rules of Civil Procedure in the amount of $100,000.