CMM CABLE REP., INC. d/b/a Creative Media Management, Plaintiff,

v.

OCEAN COAST PROPERTIES, INC. d/b/a WPOR–FM, et al., Defendants.

Civ. No. 94–290–P–H.

United States District Court, D. Maine.

Nov. 4, 1994.

Anne S. Mason, Mason & Associates, Clearwater, FL, John H. Rich, III, William J. Sheils, Perkins Thompson Hinckley & Keddy, Portland, ME, for plaintiff.

James G. Goggin, Roy S. McCandless, Verrill & Dana, Portland, ME, for defendants.

### ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

HORNBY, District Judge.

■ The plaintiff seeks issuance of a preliminary injunction against the defendants based upon copyright infringement, trademark infringement and trade dress infringement. I heard testimony and received exhibits on October 18, October 31 and November 1, 1994. In this Circuit, the standards for granting a preliminary injunction are clear. Specifically, the Court must find that (1) the plaintiff will suffer irreparable harm without the injunction; (2) this injury outweighs any harm to the defendant; (3) the plaintiff has exhibited a likelihood of success on the merits; and (4) the public interest will not be adversely affected. *See Gately v. Commonwealth of Massachusetts,* 2 F.3d 1221, 1224 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).

CMM Cable Rep. Inc., d/b/a Creative Media Management, Inc. ("CMM") designs and provides direct mail programs for radio stations to help them increase and preserve listenership. Traditionally, for competitive reasons, such services can only be sold to one

radio station at a time in a given market, and CMM follows this tradition. One of CMM's most successful promotions is its PAYROLL CHECKOFF or PAYCHECK PAYOFF direct mail contests. CMM has trademarked these items and has copyrighted the materials it has used in these campaigns at various radio stations. As noted in a recent decision and as the evidence shows here,

> [t]he general concept of the PAYROLL PAYOFF and PAYCHECK PAYOFF promotions is to entice a listener to tune into the radio station by promising payment of an "hourly wage" by the radio station if the listener calls in after his or her name is selected and read on the air. One name is read each hour during a pre-determined time span. If a listener does not call the radio station in response to his or her name being read over the air, the prior successful caller continues to be paid. This caller gets paid an amount every hour until the next successful caller responds to his or her name being read on the air or until the contest ends. Listeners supply their names to the station in response to direct mail pieces containing mail-in or fax-in forms.

*CMM Cable Rep., Inc. v. Keymarket Communications, Inc.*, 870 F.Supp. 631 (M.D.Pa. 1994). CMM has discussed this type of promotion with its Portland client WMGX, but WMGX has not yet used it, preferring other promotional devices that CMM markets. Use of the payroll- or paycheck- type campaign by a competitor like the defendant Ocean Coast Properties, Inc. d/b/a WPOR–FM ("WPOR") makes it unlikely that WMGX would purchase it from CMM.

WPOR learned of the payroll contest idea from seeing a CMM brochure that radio station WIKX ("KIX") used in the Punta Gorda, Florida, market. William Therriault of WPOR called CMM to inquire about buying the promotion, but was told that CMM could not do business with WPOR because CMM already had a client in the Portland market. WPOR then inquired of its market-

ing consultant McVay Media. McVay Media had in its files examples of "Payday" contests and "boilerplate" for a payroll-type contest. It advised WPOR to consult with its lawyers about any infringement questions before proceeding. McVay representatives also told WPOR that a number of such contests had been used over the years.[1]

WPOR then prepared a typewritten sheet of copy that it wished to use (it is not in evidence) and took the KIX brochure and the typewritten sheet of copy to its graphic designer, Graphics Northern. It told the graphic designer to prepare a brochure for a "PAYDAY contest" campaign but to avoid copying the KIX brochure. Mr. Spizuoco, the Graphics Northern designer, testified that he put away the KIX brochure before he designed the WPOR brochure. On the witness stand, he described differences between them. Those differences include such things as typestyle, colors, certain layout elements and the substitution of a time clock motif for the cowboy (boot and lariat) motif in the KIX brochure.

### Copyright Infringement

■ The standards for preliminary injunctive relief are modified somewhat in copyright infringement cases. Specifically, if likelihood of success is shown, "irreparable harm is usually presumed," *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir.1988), and there is "no need actually to prove irreparable harm." *Id.* at 612. Moreover, "the issue of public policy rarely is a genuine issue if the copyright owner has established a likelihood of success." *Id.* Finally, "where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" *Id.* (quoting *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978)). Consequently, it is clear that in a

---

1. The defendants have filed an affidavit from Charlie Cook of McVay Media in which he claims to have invented the employment metaphor for these contests in the early 1970s. Mr. Cook did not testify at trial. I have no information whether he copyrighted what he did or whether he assigned any rights to WPOR. Moreover, in the absence of seeing him testify, I am not in a position to evaluate his credibility. Accordingly, I discount the affidavit in reaching my decision.

copyright infringement case the first and critical factor to be considered is the likelihood of success on the merits. The strength of this likelihood may affect the analysis of hardship to the defendant. *Id.*

### Likelihood of Success

The copyright infringement claim here is based largely upon the assertion that the WPOR PAYDAY contest direct mailer, newspaper advertisements, radio and television commentary now being used in the Portland area infringe CMM's copyrighted direct mail brochure for WIKX in Punta Gorda, Florida. No registration certificate has been presented to the Court for the KIX brochure, but it is undisputed that CMM has filed for registration. Depending on its timing, the filing may have an impact on issues like damages and attorney fees, but it does not affect the claim for injunctive relief. *See* 17 U.S.C. §§ 412, 502. Preliminary injunctive relief is a hotly contested issue because WPOR and CMM's client, WMGX, are competitors now in the midst of the Arbitron fall sweeps. Listenership statistics accumulated now as a result of the contest will affect advertising revenue over the next six months.

In evaluating likelihood of success, I must first determine whether CMM has anything that is copyrightable. At one extreme, clearly it does, inasmuch as the copyrighted KIX brochure includes elements of text, layout and design. At the other extreme, it is also clear that CMM cannot copyright an idea. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 344–45, 111 S.Ct. 1282, 1286–87, 113 L.Ed.2d 358 (1991).[2] As Judge Learned Hand and Professor Nimmer have observed, however, the idea/expression

dichotomy, though neat, often does not solve real disputes.[3]

In essence, the parties here are fighting over the use of a radio direct mail promotion. At one level of abstraction,[4] the concept is that of a sweepstakes: names are drawn randomly for a cash award. At a different level, the concept involves an accumulating cash jackpot with a "hook" through the direct mail brochure to persuade a radio station listener to become or remain a listener to the particular station. The listener completes an entry form, mails it in, then listens to the radio station in the hope of hearing her name announced. If she calls in upon hearing her name announced, she wins a cash award that accumulates until someone else whose name is announced calls in. At still a third level, the concept involves a metaphor of employment. The listener winning the accumulating cash award is described as an employee on the payroll of the radio station who is paid a wage for listening until someone else takes her place by calling in. The fourth level is the actual words, design and layout used.

It is easy enough under *Feist Publications'* idea/expression dichotomy to conclude that the concept of a sweepstakes is not copyrightable and that the concept of an accumulating cash jackpot paid out to people who write in, listen and then telephone the station is likewise not copyrightable. But can someone copyright the metaphor of employment for these ideas on the basis that the metaphorical terminology of employment is protectible expression? If the employment metaphor is on the protected expression side of the line, has CMM contributed the modicum of originality required for copyright? *See Feist Publications,* 499 U.S. at 345–47, 111 S.Ct. at 1287–88. The answer to the last

---

**2.** I believe *Feist Publications* disposes of CMM's argument that certain 1940s and 1950s decisions give it a protectible common law copyright in the concept or idea.

**3.** *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960); 3 *Nimmer on Copyright* § 13.03[A], at 13–33.

**4.** Judge Hand first suggested the abstraction analysis:
> Upon any work and especially upon a play a great number of patterns of increasing general-

ity will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about and at times consist only of its title, but there is a point in this series of abstractions where they are no longer protected since otherwise the playwright could prevent the use of his ideas to which apart from their expression his property is never extended.

*Nichols v. Universal Pictures, Corp.,* 45 F.2d 119, 121 (2d Cir.1930).

question avoids the need to answer the more difficult one that precedes it.

■ The evidence shows that before CMM copyrighted its material, its principal, Ms. Izor, was aware of an existing radio broadcast promotion called "Working Women's Wednesday." This promotion paid an accumulating cash award on Wednesday to a woman who called in; she was termed an employee of the station until a succeeding caller displaced her. Ms. Izor gave the following questions and answers on cross-examination:

Q. What was it that caused you to think of let's have a Payroll Payoff promotion?

A. Hearing Working Women's Wednesday on the air at KTK and *hearing the actual methodology of earning an hourly wage.*

Q. Those are the things that prompted you to come up with the Payroll Payoff contest?

A. It prompted me to take that particular mechanic and expand it into a total week campaign, create graphics to go with it, make it a full-time job instead of a part-time job, make it available to everyone instead of women and make it much more than a Wednesday type contest.

Transcript of October 18, 1994 Hearing, p. 127 lines 10–20 (emphasis supplied).

Although CMM's graphics and language can be the subject of copyright, I conclude that the employment image—regardless of whether it is idea or expression—was not an original contribution by CMM within the meaning of federal copyright law. *See Feist Publications,* 499 U.S. at 345–47, 111 S.Ct. at 1287–88. Working Women's Wednesday already involved paying a wage to a listener as an "employee" for listening to the station. The fact that the "W" alliteration device limited this contest to women and Wednesdays is not sufficient to justify the conclusion that CMM's use of it for a five-day workweek and both sexes amounts to an original contribution sufficient to justify a copyright on the employment/payroll metaphor.

■ Concluding that CMM is unable to protect, by copyright, the employment image does not end the case. CMM has copyrighted specific text, layout and design in the KIX brochure that, it claims, WPOR has infringed. WPOR's access to the KIX brochure is undisputed, but did copying occur? To the average observer, the two brochures are substantially similar. Their size (8½″ × 14″) and folds are almost identical; their layout is the same in the sense that it is horizontal for all but the mailer, which is vertical and appears in a 3″ serrated form to the far right; and the participation steps—1. "FILL OUT," 2. "TUNE IN," and 3. "CALL IN"—are an important textual element. Undoubtedly Graphics Northern made some changes in preparing the WPOR brochure. It is equally clear, however, that the remaining similarities cannot be explained by coincidence. On the first page of both brochures, for example, the radio station is identified at the top, the name of the contest comes in the middle, the number of dollars available for prizes comes about three-quarters of the way down, and the last line on the page of each is "JUST FOR LISTENING." In both instances, when the brochure is opened, the top left-hand corner begins "Listen to . . ." and then the radio station is identified. At the top right of the open KIX brochure the copy reads "the best in hot new country." Across the top of the WPOR brochure appears "the best in today's hot country and your all time favorites!" At the left side of the open brochure the KIX version states: "Call in, clock in and make $50 an hour!" The WPOR brochure in almost the same position states "Call in . . . punch in and you can earn $25 an hour!" Each brochure has an arrow next to that copy with the words inside the arrow: "Here's how." In step 3 of the contest participation process, the KIX brochure states: "Call in, clock in & win!" In step 3, the WPOR brochure states: "Call in, punch in & win!" Under this heading the KIX brochure goes on to state: "When you hear your name, call: (phone number) within 10 minutes and 'clock in'!" The WPOR brochure analogue is: "When you hear your name announced on the air, call in and go 'on the clock.'" At the lower right in both brochures appears the station identification. In

the lower middle in both brochures appears the copy "complete contest rules available at (radio station)." In the return mail portion, the KIX brochure contains a check filling up the lower half of the return mailer; the WPOR brochure replaces the check with a bogus $25 bill located in almost the identical position. (The location of the return address and postal permit are standard and insignificant.)

Despite the testimony of Mr. Spizuoco, I cannot escape the conclusion that the WPOR brochure design and a significant part of the copy are based directly on the KIX brochure. Mr. Spizuoco obviously made some changes so that the two brochures have differences and can in some respects be distinguished one from the other but the evidence of copying is overwhelming. The question remains: is the copying actionable?

■ The First Circuit has held in a copyright case involving sweepstakes rules that when a particular topic permits only a limited number of ways to articulate it, copyrighting one of those versions will not protect it. *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir.1967) (*questioned in* 3 *Nimmer on Copyright* § 13.03[B], at 13–79). Under this reasoning, the choice of an 8½″ × 14″ size for the direct mail piece with two folds and a 3″ return mailer cannot be copyrighted. Similarly, use of "1, 2, 3" as the steps to take in participating in the contest cannot be protected. Expressions like "fill out" with respect to an entry form, or "tune in and listen" with respect to what a radio station listener is supposed to do, are also unprotectible.

Setting these elements aside, there is nevertheless substantial similarity—actionable copying—regardless of what infringement standard is used.[5] It is true that there are differences of color, typestyle and some textual elements. Overall, however, the two brochures appear "substantially similar" to the average observer (as well as to the experts, I conclude from the testimony). There is, therefore, a very strong likelihood that CMM will prevail on its infringement claim with respect to the brochure.[6]

■ CMM's likelihood of success on its claim that WPOR's PAYDAY contest title itself infringes CMM's KIX brochure copyright, however, is minimal. Although WPOR first learned of the Payroll contest idea from the KIX brochure, it obtained the name "Payday" from McVay Media when it discovered it could not use CMM's services. (I admitted into evidence a mockup Payday brochure and an actual radio station brochure for a Payday contest.) CMM has not made any attempt to show that the Payday contest name in the McVay Media files comes from copying CMM copyrighted material. Since WPOR obtained the contest title "Payday" from a source other than CMM, its use did not copy the CMM material and is not infringing.

Newspaper advertisements that WPOR has placed have also been admitted into evidence. The claim of infringement there is weak. At most, the language of the third step for a listener to participate (the "call in" step) draws on some of the KIX copyrighted language. Primarily, however, the advertisements use unprotectible elements of the type described in *Morrissey v. Procter & Gamble*, 379 F.2d at 678–79. The same is true for the fax, newsletter and on-the-air scripts that have been submitted.

I conclude therefore that CMM is unlikely to succeed in showing that the title "PAYDAY contest" is an infringement, that use of the employment concept for the accumulating cash prize is an infringement, or that the WPOR newspaper advertisements or broadcast commentary infringes CMM's copyright.[7] On the other hand, CMM has a strong likelihood of success in proving that

---

**5.** Professor Nimmer presents a lengthy discussion of the various tests that are used. 3 *Nimmer on Copyright* § 13.03[A].

**6.** McVay's "boilerplate" for such a contest demonstrates that there are ways to provide descriptive copy other than that used in the KIX brochure.

**7.** I realize that this is a different outcome than the court reached recently in *CMM Cable Rep., Inc. v. Keymarket Communications, Inc.*, 870 F.Supp. 631 (M.D.Pa.1994). In that case, however, the validity of CMM's copyright for work-related language was not challenged.

the WPOR direct mail brochure infringes its copyright. Because this is a copyright case, there is no need for CMM to prove irreparable harm and public policy is not an issue. There is no significant harm to the defendant in prohibiting further publication of the brochures (the defendants concede that the brochure distribution stage of their contest is over), and in any event CMM's strong likelihood of success reduces consideration of harm to the defendants. *See Concrete Machinery Co., supra.* On this reasoning, CMM is entitled to a preliminary injunction prohibiting any further distribution or printing of brochures; and impoundment of all unused brochures; but not any prohibition on the continuance of WPOR's PAYDAY contest.

### Trademark and Trade Dress

I reach the same conclusion on CMM's claim with respect to its trademark claims for PAYCHECK PAYOFF and PAYROLL PAYOFF under 15 U.S.C. § 1114 and its claim of unfair competition under the Lanham Act, 15 U.S.C. § 1125 (trade dress). I observe first that Payday itself appears to be trademarked by Boom Media in the form "Workday Payday." Defs.' Ex. 7. Neither side has addressed the significance of this (if any).

The First Circuit has listed eight factors to consider in assessing the likelihood of confusion in this context: (1) similarity of the marks; (2) similarity of the goods; (3) relationship between the parties' channels of trade; (4) relationship between the parties' advertisements; (5) classes of prospective purchasers; (6) evidence of actual confusion; (7) defendant's intent in adopting its mark; (8) strength of the plaintiff's mark. *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 29 (1st Cir.1989).

Consideration of the first factor, similarity of the marks, leans against confusion. "Payroll," "paycheck" and "payday" are all related to wages and all have the same first syllable. Each describes an entirely different concept, however, that can be separately defined. Anyone who has ever worked understands the differences between a payroll and a payday or a paycheck and a payday.

"Payoff," moreover, has an entirely different connotation than "contest." When the two words are put together, such as "PAYROLL PAYOFF," the effect is very different from "PAYDAY contest."

The next four factors make the case for confusion easier for CMM. Although WPOR and CMM are not direct competitors, CMM markets its services to competitors of WPOR and, for purposes of this analysis, the goods (2), trade channels (3), advertising (4), and class of prospective purchasers (5) must be considered identical.

There is limited evidence of actual confusion (6). WMGX, WPOR's competitor, called CMM as soon as it heard of WPOR's PAYDAY contest to see if CMM had started dealing with WPOR and others in the industry testified that they associated this type of contest with CMM. But the industry is large and there was also testimony of awareness of similar contests *not* related to CMM.

WPOR's intent (7) does not point clearly in either direction. WPOR wanted to run the contest and, when it could not do so with CMM's help, resolved to find another way. Through McVay, it did find another source. But WPOR had no logical motive to have its promotion confused with CMM sponsorship or marks. WPOR's only audience was listeners who have no knowledge of CMM. This is not a "passing off" type of case.

Finally, the strength of the mark (8) does not cut in either direction. These appear to be "suggestive" marks, neither the weakest ("generic") nor the strongest ("arbitrary") of marks. *See S.S. Kresge Co. v. United Factory Outlet, Inc.,* 598 F.2d 694, 696 (1st Cir. 1979).

Considering all these factors together in assessing the likelihood of confusion, I conclude that CMM has not shown a likelihood of success on its trademark infringement claim. The First Circuit has said that the analysis of a trade dress claim is similar. *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 160 (1st Cir.1977). I conclude, therefore, that CMM's likelihood of success is no greater on its § 1125 claim.

\*     \*     \*     \*     \*     \*

In light of the limited nature of the injunctive relief that I am providing, I find that no bond is necessary. WPOR is not being prevented from continuing its contest through the end of the current Arbitron sweeps season and there is minimal harm to it in ordering the discontinuance of its present brochure. There is likewise little harm to it in impounding existing unused supplies of the brochure.

So ORDERED.